**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-64-CKK** |
| **TOMMY FREDERICK ALLAN,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Tommy Frederick Allan to 24 months' incarceration, the middle of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment.

## I.    INTRODUCTION

Allan participated in the January 6, 2021 Capitol Breach, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

Before arriving in Washington, D.C., Allan posted numerous messages to social media regarding his belief that the 2020 election had been stolen and that action had to be taken to

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

prevent the transfer of power.

As the rally concluded, Allan became aware the rioters had breached the Capitol. He chose to join them in order to "storm" the building himself. After climbing a rope up the side of the Capitol, Allan entered the building though a fire door next to the Senate Parliamentarian's office which had been broken open by rioters. He entered the Parliamentarian's office and then walked through the halls of the Capitol for approximately 15 minutes, during which time he stole an American flag. He joined a group of rioters confronting Capitol Police officers near the North Door and put himself at the front line. When rioters pushed through this police line, he climbed up a flight of stairs and entered the Senate Chamber. While inside, he stood on the dais as fellow rioters chanted slogans, and stole paperwork from the front desk. After Capitol Police forced rioters out of the Senate Chamber, Allan was made to give up his flag and escorted out of the building. Allan held up his stolen papers like a trophy to the crowd outside, and then crossed the street and bragged on a Facebook live stream about his exploits, claiming that he scaled a wall to get into the Capitol, and proudly displaying the stolen documents. When he returned home, Allan deleted his Facebook account and destroyed the documents he had stolen in an effort to hide the evidence of his unlawful conduct. Allan declined to be interviewed by law enforcement officers when they visited his home a week later. The next day got rid of his cellphone because it contained evidence of his participation in the attack.

The government recommends that the Court sentence Allan to 24 months' incarceration, which is the middle of the applicable 21 to 27 months range. A 24-month sentence acknowledges his admission of guilt, but also reflects the gravity of Allan's conduct and the need to deter Allan and others from similar conduct.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government incorporates by reference the details of the attack as explained in the PSI and the Statement of Offense incorporated into Allan's plea agreement. *See* Statement of Offense at ¶¶ 1-7; PSI at ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

The rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This

3

included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/2021-0224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of nearly $1.5 million. *See* PSI ¶ 16.

### *Breach of the Capitol Building at the Parliamentarian Door*

One of the main breach points through which rioters entered the Capitol Building was a fire door near the Senate Parliamentarian's Office which opened onto the Northwest Courtyard of the Capitol ("Parliamentarian Door"). In Images 1 and 2 below, the Parliamentarian Door is circled in red.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525*



*Image 2: Screenshot from open source video depicting Parliamentarian door as it appeared at about 2:13 pm*

About 1:48 p.m., rioters in the West Plaza broke through a police line at the base of the Northwest Scaffolding and climbed the Northwest Steps to the Upper West Plaza. Rioters under the Northwest Scaffolding were stopped temporarily by police, but at about 2:09 p.m., they broke

through and streamed up the stairs to the Northwest Courtyard. Many of these rioters headed

straight towards the Senate Wing Doors, but others remained in the Northwest Courtyard.

About 2:40 p.m., the rioters began attacking the Parliamentarian Door. Shortly thereafter,

a rioter broke a window in the door and opened it from the outside. *See* Exhibit 1 at :57.[2]



*Screenshot from Exhibit 1 at :57*

Officers attempted to stop rioters from entering but were soon overrun.



*Screenshot from Exhibit 1 at 1:13*

Officers did not secure the door again until approximately 3:02 p.m., almost half an hour

later.

---

[2] Exhibit 1 is an excerpt of Capitol security video. Due to problems with the original recording, video from the lower half of the screen occasionally suffers from interference.

**B. Allan's Role in the January 6, 2021, Attack on the Capitol**

Prior to January 6, 2021, Allan's Facebook posts were filled with claims that the 2020 election had been stolen and that violence was needed on January 6th to stop the transfer of power to President Biden.

For example, on December 20, 2020, Allan encouraged a Facebook friend to "say no to this stolen election" and "Fight with your fist. I might have to."

> **Time** 2020-12-20 11:56:07 UTC
> **Type** Comments
> **Summary** Tommy Allan commented on a post from December 19, 2020. `I expect you to Stand Up and say no to this stolen election. Stand up, like you did at the convention. Stand Up and Fight. Fight with your fist. I might have to.`

On December 21, 2020, Allan referenced a conspiracy theory regarding Dominion voting machines and asserted "[w]e stand and fight now or our country is Lost. Go to Washington DC January 6th"

> **Time** 2020-12-21 02:07:42 UTC
> **Type** Comments
> **Summary** Tommy Allan commented on a post from December 20, 2020. `What good is a recall if they are using the same Dominion counting machines. All confidence is lost. Same goes for the Georgia senate runoff race. We stand and fight now or our country is Lost. Go to Washington DC January 6th.`

On December 30, 2020, Allan suggested that accepting the results of the 2020 election would be turning the country over to "the commies" and said "Hell No! We fight. Marshall [*sic*] Law. Whatever it takes. Go to Washington, D.C. on January 6th."

> **Time** 2020-12-30 23:44:19 UTC
> **Type** Comments
> **Summary** Tommy Allan commented on a post from December 30, 2020. `So we just turn our country over to the commies. I say Hell No! We fight. Marshall Law. Whatever it takes. Go to Washington DC on January 6th.`
> **Object Id** S:_I1012929892:757254988211391:109

On January 1, 2021, Allan posted "I will do all in my power to prevent Fraudulent Beijing Biden and the CCP from taking over my country. I'm not done fighting! On the contrary, I'm marching

7

to the battlefield."

**Time** 2021-01-01 08:19:42 UTC
**Message** Its 2021. Nothing has changed. Trump Won. The election was rigged.  I will do all in my power to prevent Fraudulent Beijing Biden and the CCP from taking over my country. I'm not done fighting! On the contrary,  I'm marching to the battlefield.

Prior to arriving in Washington, D.C., Allan was already focusing on occupying the Capitol Building, as opposed to merely attending the rally near the Washington Monument. On January 2, 2021, Allan posted an advertisement for something called "Operation Occupy the Capitol" scheduled to occur on January 6, 2021.

**Posted** 2021-01-02 13:05:35 UTC
**Status**
**Mobile** true
**Id** 10221093968751526



On January 3, 2021, Allan posted "War sucks. I hope we can avoid it. But if these bastards won't hear the evidence….its on."

**Time** 2021-01-03 08:45:27 UTC
**Message** War sucks. I hope we can avoid it. But if theses bastards won't hear the evidence….its on.

Later on January 3, 2021, Allan posted that he expected that when he and others arrived in Washington, D.C., they would "[o]rganize, plot, plan, fight."

8

> **Time** 2021-01-03 15:18:27 UTC
> **Message** Hotel rates in Washington DC have doubled. Many hotels are full. Patriots will be there. I hope you will join us. We are forming a 1,000,000 man Army of Patriots. I have no idea what we will do after that. Organize, plot, plan, fight. IDK. ...but I will be there.

Allan also expressed a desire to meet various paramilitary groups. On December 27, 2021, Allan said he was hoping to "hook up" with the Proud Boys.[3]

> **Time** 2020-12-27 11:53:25 UTC
> **Type** Comments
> **Summary** Tommy Allan replied to a comment on a post from December 23, 2020.
> `@[100002290745407:2048:Maggi Connelly] I will be in Washington DC January 6th. Coming from California with other Patriots hoping to hook up with the Proud Boys.`

Allan flew from California to Washington, D.C. on January 5. He attended the rally, taking pictures with his cellphone, and posting on social media. One of Allan's posts showed members of the Three Percenters, another paramilitary organization,[4] who were dressed in tactical gear. Allan posted their picture with the message "These are my people. PATRIOTS."

---

[3] The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos and slogans to public events.

[4] Militia extremists sometimes call themselves three percenters ("III%ers" or "threepers") based on the myth that only three percent of American colonists took up arms against the British during the American Revolution. Some III%ers regard the present-day US Government as analogous to British authorities during the Revolution in terms of infringements on civil liberties. While many independent or multi-state militia groups incorporate III% in their unit names, the term is less indicative of membership in a single overarching group than it is representative of a common belief in the notion that a small force with a just cause can overthrow a tyrannical government if armed and prepared.



According to Allan's Facebook records, Allan was a member of a Facebook Group called "3% of California (Nationally Affiliated)."

**Name** 3% of California(Nationally Affiliated)
**Id** 588045564641892

At approximately 1:10 p.m., as the rally was concluding, Allan posted "We fight for our country" followed by "Fight for Trump!"

**Time** 2021-01-06 18:10:58 UTC
**Message** We fight for our country.

**Time** 2021-01-06 18:11:14 UTC
**Message** Fight for Trump!

At approximately 2:12 p.m., Allan posted that he was headed to the Capitol and he was aware "[s]ome have already stormed the barricades."

**Time** 2021-01-06 19:12:27 UTC
**Message** To the Capital we go. Some have already stormed the barricades.  Patriots!

As Allan walked towards the Capitol, he took a video, stating "Everybody's marching to

the Capitol." *See* Exhibit 2.[5]



*Screenshot from Exhibit 2 at :07*

Allan entered the Capitol Grounds on the West Lawn, which was occupied by rioters. Allan stopped to record video of rioters using bike racks, intended as barriers, as make-shift ladders to climb over obstacles on the West Lawn, saying "We're storming the walls." *See* Exhibit 3.[6]



*Screenshot from Exhibit 3 at :04*

Allan made his way to the area underneath the Northwest Steps, *see* Image 1 (Yellow Circle), which was filled by rioters climbing the steps to the Northwest Courtyard. From his

---

[5] Exhibit 2 is a video posted to Allan's Facebook account and obtained via search warrant.
[6] Exhibit 3 is a video posted to Allan's Facebook account and obtained via search warrant.

position below the steps, Allan grabbed a rope hanging from the top of the steps and used it to scale the wall to reach an upper portion of the Northwest Steps. *See* Exhibit 4.[7] On reaching the top, Allan raised his fist in celebration and then proceeded up the stairs.



*Screenshots from Exhibit 4 at :21, :31*

Allan stopped at the top of the Northwest steps to take a video of the rioters below him, saying "They're storming the building. They're literally storming the walls." *See* Exhibit 5.[8]



*Screenshot from Exhibit 5 at :03*

Allan continued to the Northwest Courtyard. He stopped to record video of the rioters occupying the area, narrating the scene with: "F*cking, they're breaking the windows down!

---

[7] Exhibit 4 is an excerpt from Capitol security video.
[8] Exhibit 5 is a video posted to Allan's Facebook account and obtained via search warrant.

They're kicking in the windows! They're breaking the windows! We f*cking fought! You're either with us or against us! Freedom or tyranny! Liberty or tyranny! Good or evil! That's how I see it." *See* Exhibit 6.[9]



*Screenshot of Exhibit 6 at :07*

About 2:45 p.m., Allan entered the building through the Parliamentarian Door, just minutes after the first rioters broke in. Exhibit 7, cellphone video recorded by another rioter who entered shortly after Allan, shows the chaotic scene, including the piercing alarm Allan heard as he entered. *See* Exhibit 7 at :01.[10] Allan immediately stopped to record the scene with his cellphone. *See* Ex. 1, at 4:30; Exhibit 8, at :05.[11]

---

[9] Exhibit 6 is a video posted to Allan's Facebook account and obtained via search warrant.

[10] Exhibit 7 is an excerpt from a publicly available video located at https://vimeo.com/500245716.

[11] Exhibit 8 is an excerpt from Capitol security video.



*Screenshot from Exhibit 1 at 4:30; Exhibit 8 at :05*

After entering the building, Allan turned right and entered the Parliamentarian's Office. *See* Exhibit 8 at :32.



*Screenshot of Exhibit 8 at :32*

Allan remained inside the Parliamentarian's Office for approximately a minute, where he saw that rioters were rummaging through files, destroying furniture, stealing, and throwing books and papers on the floor. Video taken by another rioter shows the damage and destruction inside the office as Allan leaned against the wall checking his phone. *See* Exhibit 9.[12]

---

[12] Exhibit 9 is a publicly available video located at
https://jan6archive.com/twitter/BrendonLeslie_1346932300835999746.mp4



*Screenshot of Exhibit 9 at :07*

Allan left the Parliamentarian's Office, *see* Ex. 7 at :27; Ex. 8 at 1:38, and walked with other rioters towards the North Door Appointment Desk. *See* Image 1 (Purple Circle). During this time, Allan stole a large United States flag and flagpole he saw in one of the hallways. Allan arrived at the Appointment Desk at about 2:59 p.m., carrying the flagpole, and joined a group of rioters confronting police. After about 30 seconds, Allan moved forward to confront police directly, pointing his finger in one officer's face. *See* Exhibit 10.



*Screenshot of Exhibit 10 at :49*

Allan remained at the front line of the rioters for approximately one minute, before

15

stepping aside to adjust the flag. As he did so, other rioters broke through the police line and

Allan joined them as they pushed east past the Appointment Desk. *See* Ex. 10 at 2:03.

After passing the police line, Allan climbed a set of stairs leading to the second floor,

near the entrance to the Senate. *See* Exhibit 11.[13]



*Screenshot from Exhibit 11 at :15*

Allan entered the Senate Chamber at about 3:03 p.m. Upon entry, Allan once again raised

his fist in celebration. *See* Exhibit 12 at :12.[14]



*Screenshot from Exhibit 12 at :12*

---

[13] Exhibit 11 is an excerpt from Capitol security video.
[14] Exhibit 12 is an excerpt from Senate chamber video.

Allan moved directly towards the center of the Chamber and climbed the dais, along with a number of rioters, including Jacob Chansley, the so-called QAnon Shaman. Allan waved the stolen flag back and forth as rioters screamed from atop the dais. *See* Exhibit 13 at 1:02.



*Screenshot from Exhibit 13 at 1:07*

Allan stood with his arm raised as Chansley issued an incantation over his bullhorn, accusing members of Congress of being "traitors." *See* Ex. 13 at 2:49.[15]



*Screenshot from Exhibit 13 at 2:49*

Allan then moved to the desk of the Journal Clerk, Parliamentarian, Legislative Clerk,

---

[15] Exhibit 13 is an excerpt from Senate chamber video.

and Assistant Secretary of the Senate ("Front Desk"). While there, Allan noticed paperwork left there by the Senate staff who had evacuated the Chamber. Allan took some of the papers, rolled them up, and stuck them in his back pocket. *See* Exhibit 14 at :16, :30.[16]



*Screenshots from Exhibit 14 at :16, :30*

Allan continued walking around the Senate Chamber until about 3:08 p.m., when officers arrived to force empty rioters from the Chamber. *See* Ex. 12 at 5:45.



*Screenshot from Exhibit 12 at 5:45*

---

[16] Exhibit 14 is an excerpt from a publicly available video located at
https://www.newyorker.com/video/watch/a-reporters-footage-from-inside-the-capitol-siege.

Allan exited through the east door, still carrying the stolen papers and flag. An officer took the flag back from Allan, and he was escorted to a nearby staircase and ordered by the officer to leave the building. *See* Exhibit 15.[17]



*Screenshot from Exhibit 15 at :27*

Allan stopped along the way and had to be told again by another officer to leave the Capitol. *See* Exhibit 16.[18]



*Screenshot from Exhibit 16 at :18*

---

[17] Exhibit 15 is an excerpt of Capitol security video.
[18] Exhibit 16 is an excerpt from the body-worn camera video of a Metropolitan Police Department Officer. The camera was not recording audio at this time.

Allan left the building at approximately 3:10 p.m., along with other rioters. Before leaving, Allan, still clutching the stolen papers with one hand, patted Chansley on the back with his other hand. *See* Exhibit 17.[19] In total, Allan was inside the Capitol for approximately 30 minutes.



*Screenshot from Exhibit 17 at :40*

After exiting the Capitol, Allan encountered a crowd standing outside. Allan raised his arms in triumph, and as Chansley yelled to the crowd, Allan held up the stolen papers to show the crowd. *See* Exhibit 18.[20]

Allan walked across the street, where he stopped to talk to someone recording a Facebook video. *See* Exhibit 19.[21] Allan told them "I was in the f*cking halls of the Senate" and took out the papers he had stolen. Allan held them up to the camera, stating that he had stolen them from "McConnell's desk" – a reference to the Senate minority leader.

---

[19] Exhibit 17 is an excerpt from Capitol security video.
[20] Exhibit 18 is a publicly available video located at
https://archive.org/details/nYsA5AP5qkoD73Cah.
[21] Exhibit 19 is an excerpt from a Facebook Live video provided to the FBI tip line.



*Screenshot from Exhibit 19 at :24*

He held up another document, apparently signed by the former president, saying "Here's a Trump f*cking letter, right here. Trump signed it. I took this off f*cking McConnell's desk."



*Screenshot from Exhibit 19 at :31*

When asked how he knew which desk was McConnell's, Allan said, "well, I went to the very top desk" and asked the people around him to confirm that "McConnell's the head of the Senate." Allan then pointed at the Capitol and said "I came from California to do this . . . Storming the motherf*cking building. And when they brought those walls down, I stormed it. I

21

stormed it, for all the sh*t you're saying. You don't have to f*cking preach to me, brother. . . . I f*cking lived it." When asked to describe what happened when he first went in, Allan said "we just pushed" and the police "cowered." Allan said the same thing happened in the next hallway, and "the next thing I know, I'm f*cking in the halls of the Senate."



*Screenshot from Exhibit 19 at 1:32*

Allan described the paperwork spread throughout the dais, and said "some people started grabbing shit, and I was, like, uh, no bro. Don't f*cking, don't destroy our sit-in. You know, don't do that . . . I didn't feel good about that."

When asked, in light of that comment, why he had stolen the paperwork, Allan said "I'm a taxpayer. I paid for this." Allan then said he had also taken a flag, but that "They took my flag. They took it from me right before I left." Allan said he thought he could probably get the same paperwork on-line, but that "It's different taking it off the f*ucking . . ." Allan then said "everybody always talks sh*t about me at home. You, know, I'm the f*cking lone patriot. It's a bunch of f*cking liberals, and then me. Well, I f*cking lived up to my word."

22

After the riot was over, Allan called it the "Best day ever" and an "Awesome Day."

**Time** 2021-01-06 22:50:43 UTC
**Type** Comments
**Summary** Tommy Allan commented on a post from January 6. `Best day ever.`
**Object Id** S:_I1012929892:733484313959364:20

**Time** 2021-01-06 22:56:54 UTC
**Type** Comments
**Summary** Tommy Allan commented on a post from January 6. `Awesome Day. And God was glorified.`

Allan sent a picture to a Facebook friend of the stolen documents, saying they "came from the desk of Mitch McConnell."



**Author** Tommy Allan (Facebook: 1012929892)
**Sent** 2021-01-06 23:01:24 UTC
**Body** Bro.  First, Happy New Year.  That picture i just sent you.  Came from the desk of Mitch McConnell. Yes, from the well of the senate. Thank me later.

Allan admitted he had also stolen a cigar from the Senate.

**Author** Tommy Allan (Facebook: 1012929892)
**Sent** 2021-01-07 02:50:27 UTC
**Body** May of grabbed the cigar off the senate desk too. Figured I paid for it.

Describing his actions earlier in the day, Allan bragged that he had been "on the front lines."

> **Time** 2021-01-06 23:25:40 UTC
> **Type** Comments
> **Summary** Tommy Allan replied to your comment on a post from January 6.
> `@[1012929892:2048:Tommy Allan] and I was on the front lines.`
> **Object Id** S:_I1012929892:733484313959364:31

Allan also described the attack on the Capitol as the "diplomatic phase" and threatened that if Congress did not listen to "the evidence" then "things will get worse."

> **Time** 2021-01-06 23:09:10 UTC
> **Type** Comments
> **Summary** Tommy Allan commented on a post from January 6. `Screw You. This is the diplomatic phase. Hear the evidence or things will get worse.`

Over a photograph of a statuette of a lion, Allan posted "You don't want to hear the evidence. Fine! Here *[sic]* my Roar you f*cking communist bastards. Give me liberty or give me death."



> **Time** 2021-01-07 00:25:54 UTC
> **Type** Photos
> **Summary** You don't want to hear the evidence. Fine! Here my Roar you fucking communist bastards. Give me freedom or give me death.

Late in the evening of January 6, 2021, Allan posted that he had "fought" for the former president that day and promised to do so again.

24

> **Time**    2021-01-07 04:03:35 UTC
> **Type**    Comments
> **Summary**   Tommy Allan commented on a post from January 6. `Never concede. We fight. I
>              fought for you today and I will step up again.`

Allan also made clear that the people who attacked the Capitol were Trump supporters like himself, and he was proud of what they had done at the Capitol.

> **Summary**   Tommy Allan replied to a comment on a post from January 6.
>              `@[100003546728758:2048:Rose Garrison] It was all Trump supporters. And I'm
>              proud of that.  I don't want BLM to take any credit for our patriotic actions.`

On January 7, upon his return to California, Allan destroyed evidence of his conduct at the Capitol. He deleted his Facebook account, which contained the videos he recorded at the Capitol and his posts demonstrating his intent in traveling to Washington, D.C. on January 6th. Allan also destroyed the documents he had taken from the Senate Chamber by burning them in his backyard.

Records from Facebook showed that the cellphone Allan carried on January 6th had been used to take several of the photos from the Capitol posted to Allan's account.

On January 15, 2021, FBI agents visited Allan at home. After explaining that Allan was not under arrest and was free to leave, the agents told Allan that the FBI had evidence that Allan had been inside the Capitol on January 6, 2021. Allan asked to speak to a lawyer and terminated the meeting. Records from T-Mobile show that the next day, January 16, 2021, Allan deactivated his cellphone and switched to a new phone. The original cellphone was not present when agents searched Allan's house in connection with his arrest on January 22, 2021.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 20, 2021, Allan was charged by complaint with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and

Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Violent Entry and Disorderly Conduct on Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(A), (D), and (G); and Theft of Government Property, in violation of 18 U.S.C. § 641. On January 22, 2021, Allan was arrested in California and released on bond.

On December 8, 2021, Allan was charged in a second superseding indictment with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Theft of Government Property, in violation of 18 U.S.C. § 641; Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G); and Corruptly Altering, Destroying, Mutilating, or Concealing a Record, Document, or Other Object, in violation of 18 U.S.C. §§ 1512(c)(1) and 2.

On August 11, 2022, Allan pleaded guilty to the charge of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Allan now faces sentencing on a single count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2). As noted by the plea agreement and the U.S. Probation Office, Allan faces up to 20 years of imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years.

26

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As set forth in the plea agreement, ECF No. 39, the parties agree with the Sentencing Guidelines calculation set forth in the PSI, which calculated Allan's adjusted offense level under the Sentencing Guidelines as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | [14] |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference | [+3] |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | [+2] |
| | Total | [19] |

*See* PSI at ¶¶ 47-51.

The government agrees that Allan has demonstrated acceptance of responsibility for the offense, and that a two-level reduction under Guidelines Section 3E1.1(a) is appropriate. *See* PSI at ¶¶ 54-55.

The U.S. Probation Office calculated Allan's criminal history as a category I, which is not disputed. *See* PSI at ¶ 59. Accordingly, the U.S. Probation Office calculated Allan's total offense level at 16, and his corresponding Guidelines imprisonment range at 21-27 months. *See* PSI at ¶ 103.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). As described below, the Section 3553(a) factors warrant incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who participated in the riot did so under the most extreme of circumstances, to which their conduct directly contributed. Anyone who made it to the Capitol would—at a minimum— have crossed through several barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, besides their own acts of violence, they likely would have observed other extensive fighting with police. Allan and the other rioters successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence. As noted above, the rioters injured over a hundred police officers and terrified

individuals on scene that day, leaving significant emotional scars. They created more than $2.8 million in losses. This number understates the extent of the property damage, as it does not include the irreparable and unquantifiable damage to artwork, statues, and other artifacts that were stolen or damaged.

When looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement officials; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help place each individual defendant on a spectrum as to their fair punishment.

The nature and circumstances of Allan's crime weigh heavily towards a term of incarceration. Unlike many other January 6th defendants, Allan did not just walk into the Capitol - he climbed a rope to get there, a stark demonstration that he was truly "storming" the Capitol as he so eagerly anticipated. Allan was no mere spectator. He was one of the first rioters to enter through the Parliamentarian Door and he did not hesitate to enter the Parliamentarian's Office, where he saw the wreckage being caused by his fellow rioters. Undeterred, Allan moved further into the Capitol, stole a flag, and marched with it to the next police line. There, Allan moved to

the front line of rioters, directly confronting the police. And when that police line broke, Allan brazenly marched past officers to enter the Senate Chamber itself – the heart of the certification process. While inside the Senate Chamber, Allan stole documents and paraded around the room with his stolen flagpole until forced out by police. All of this occurred mere minutes after the Vice President of the United States was evacuated from the Senate Chamber, and as members and staff took shelter from the mob, fearing for their lives. What should have been a day in which Congress fulfilled its solemn, constitutional duty in certifying the vote count of the Electoral College, ensuring the peaceful transition of power in our nation, was disrupted by a mob of thousands on January 6, 2021. And Allan was, quite literally, one of their flagbearers.

Nor were Allan's actions spontaneous or provoked. Allan's social media posts show that he anticipated violence on January 6th and that he had no intention of limiting his conduct to simply attending the rally. Rather, he planned for weeks to "fight" and "storm" the Capitol Building itself, and he believed violence was necessary and appropriate in order to prevent the peaceful transfer of power. His posts show an admiration for para-military groups who came to the Capitol prepared for violence and a desire to be with these groups on January 6th. Before he got to the Capitol, Allan was aware that "[s]ome have already stormed the barricades." Before he ever made it inside, Allan saw the rioters using stolen barricades as ladders and attacking the outnumbered police at the Northwest steps. And immediately after leaving the Capitol, Allan admitted that his entry into the Capitol had not been a last minute decision, but rather that he "came from California to do this. . . . Storming the mother*cking building" and that by disrupting the certification he had "lived up to [his] word."

Allan's other statements are also concerning. Rather than showing remorse for his

participation in the assault on the Capitol, Allan was clearly proud. Allan did not hesitate to show off the stolen documents and could barely contain his joy when describing how the police "cowered" from the rioters. He thought of the riot as the "[b]est day ever" and promised to participate in future violence. And he was anxious to express his pride that it was Trump supporters, and not "BLM," who had attacked the Capitol.

Although supremely proud of his conduct, Allan was reluctant to face the consequences. As soon as he returned home, Allan worked diligently to erase the evidence of his crimes, burning the stolen documents and deleting his Facebook account. The day after a visit from the FBI, when he declined to speak voluntarily, Allan got rid of the cellphone containing incriminating evidence of his participation in the attack.

The nature of Allan's conduct, both individually and as part of the mob, warrants a significant sentence.

### B.     Allan's History and Characteristics

Allan has only one criminal history point, has maintained employment, and has complied with the conditions of his release. These aspects of his history and characteristics are mitigating, but they are not present to such a degree that they warrant a downward variance. Mr. Allan is neither the sole breadwinner for his family, nor is he solely responsible for the care of his children.

Moreover, while Allan was one of the first January 6th defendants to be arrested, he was not among the first to accept responsibility and plead guilty – his plea came approximately 20 months after his arrest. And, unlike many defendants, Allan has never offered to speak with law enforcement officials about the events of January 6th. On balance, this factor supports the

government's sentencing recommendation.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6th showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[22] As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. When Allan made his way into the Capitol, it was abundantly clear to him that lawmakers, and the police officers trying to protect them, were under siege by rioters. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. Allan directly, and physically, added to that danger by his trespass and his confrontations. The ease with which he stole a United States flag from the Capitol shows disrespect for this country, his willingness to steal documents from the Senate shows disrespect for Congress and our nation's laws, and his destruction of evidence shows contempt for the legal process.

The government submits that this factor also requires a sentence of imprisonment. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police, and against Congress, are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[22] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[23] And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The need for general deterrence is particularly urgent in the case of crimes arising out of January 6th. The threat of future political violence is not merely theoretical. As Judge Berman Jackson recently noted, "The heated, inflammatory rhetoric that brought the defendant to the district has not subsided . . . the lie that the election was stolen or illegitimate is still being propagated . . . and some prominent figures . . . are cagily predicting or even outright calling for violence in the streets" if Former President Trump is charged with a crime. *See United States v. Young*, 21-cr-291-ABJ, ECF No. 170, at 61-62.

---

[23] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Although it is clear from his destruction of evidence that he wished to avoid the consequences of his actions, Allan did not express any remorse for his actions prior to his arrest, and his statements immediately after the riot were those of a man gloating over victory in battle.

With respect to the need to protect the public from his actions, the Court should consider Allan's actions on that day, but also the broader danger to our democracy that Allan's actions implicate. His actions struck at the root of our democracy. When faced with an election outcome he did not like, he indulged in a fantasy, without any evidence, for why the election didn't count. He then acted on this fantasy, joining a flood of rioters who took the Senate and accomplished a goal many could never have imagined—halting the peaceful transfer of power upon which our democracy is built. And when it was all over, Allan was not contrite or remorseful, but proud of what he had done. It is unlikely that Allan's worldview has changed so much that he will be deterred from similar conduct in the future absent a significant sentence.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007);

28 U.S.C. § 994(m). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines provide the most helpful benchmark. As this Court knows, the government has charged many persons with crimes based on the January 6th attack, including hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

**F.     Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); accord United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within

the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

The government submits that the most relevant comparisons to this case are three other January 6th defendants who entered the Senate Chamber and were convicted of violating § 1512(c)(2): *United States v. Paul Hodgkins*, 21-cr-88-RDM, *United States v. Jacob Chansley*, 21-cr-3-RCL, and *United States v. Christine Priola*, 22-cr-242-TSC.

Hodgkins unlawfully entered the U.S. Capitol at around 2:50 p.m., carrying a backpack that had, among other items, protective eye goggles, rope, and white latex gloves. By 3:00 p.m., Hodgkins made it to the floor of the Senate, where he took several selfies and stood near Allan on the dais. Unlike Allan, Hodgkins did not receive a two-level adjustment for destruction of evidence and so faced a lower Guideline range. In addition, unlike Allan, Hodgkins demonstrated extraordinary acceptance of responsibility and was the very first January 6th defendant to be sentenced for a violation of § 1512(c). The government recommended a sentence of 18 months, in the middle of his 15-21 month range. Judge Moss granted a downward departure to 8 months.

Priola, a former occupational therapist at a local school district, joined the front lines of the riot and entered the Capitol building soon after other rioters overcame the police officers guarding the East Rotunda (Columbus) doors. Priola carried a large sign reading, "WE THE PEOPLE TAKE BACK OUR COUNTRY" on one side and "THE CHILDREN CRY OUT FOR JUSTICE" on the other side. Once in the building, Priola made her way to the Senate floor. While there, Priola spoke to an associate by telephone and encouraged that person to come inside

either the Capitol or the Senate Chamber, saying it was "now or never." Priola declined to be interviewed by law enforcement officers during the execution of a search warrant at her residence on January 9, 2021. Sometime before January 13, Priola deleted from her cellular telephone photos, videos, chats, and messages regarding her activities on and around January 6th. From a Guidelines range of 15 to 21 months, lower than Allan's, Judge Chutkan sentenced Priola to 15 months incarceration and 12 months supervised release.

Chansley entered the building at around 2:14 p.m., among the first rioters to enter through the Senate Wing Door. He confronted police outside the Senate and carried a bullhorn to rile up the crowd. At around 2:52 p.m., Chansley entered the Senate Gallery, screaming obscenities, and then proceeded down a staircase to enter the Chamber itself. While there, Chansley occupied the dais next to Allan and led the rioters in an incantation. Chansley faced a higher sentencing range than Allan -- 41 to 51 months -- because he received an enhancement for threatening to cause physical injury. But Chansley did not destroy any evidence, and thus, unlike Allan, did not receive an enhancement for obstruction of justice. Also unlike Allan, Chansley demonstrated extraordinary acceptance of responsibility by affirmatively contacting law enforcement officials and agreeing to speak with them almost immediately after the attack. On January 7, 2021, he called the FBI to identify himself, and drove on January 9, 2021 to the an FBI field office to continue his interview, at which time he was arrested. Chansley was also, like Hodgkins but unlike Allan, one of the first January 6th defendants to accept responsibility and plead guilty. And, unlike Allan, Chansley presented documentation regarding a mental health problem. Ultimately, Judge Lamberth determined that despite the factors in Chansley's favor, the "horrific" nature of the crime led him not to downwardly depart, and to give a sentence of 41

months.

Allan's conduct lies somewhere between that of Hodgkins and Priola, on one hand, and Chansley, on the other. A sentence in the middle of Allan's guideline range would not create any undue sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[24] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Allan must pay $2,000 in restitution to the Architect of the

---

[24] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Capitol, which reflects in part the role Allan played in the riot on January 6th.[25] (*See* Plea Agreement at ¶ 14.) As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Allan's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSI ¶ 104.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 24 months.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


BY:    /s/   Robert Juman
ROBERT JUMAN
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

---

[25] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).