**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | No.   **21-cr-064 (CKK)** |
| **TOMMY ALLAN** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

> Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Mr. Allan is a 54 year old Veteran and family man who has already suffered in many ways as a result of his conduct. In the past two years, Mr. Allan has anguished every day over his actions that he is sincerely ashamed of. He has not only been in a constant state of turmoil over his actions but also of the fear of what will happen to him and his family if he goes to prison. Because of his actions on January 6, 2021, Mr. Allan risks losing the business that he and his wife built themselves – a business that even endured through the national pandemic. This anguish has been more of a deterrence than any jail sentence could ever achieve.

Despite Mr. Allan's disrespectful and thoughtless conduct on January 6, 2021, the fact remains that he was never violent, never destroyed property, and did

1

not bring weapons or act in concert with extremist groups. He also did not pre-plan going to the Senate chamber, or have any desire, knowledge, or understanding that he was headed towards the Senate chamber, but rather found himself there – notably not wearing combat gear or having any items indicating he was prepared for violence. Mr. Allan did not want violence to occur, has never participated in violence or been in a fist fight, and he was horrified when he realized what he was a part of that day. Embarrassed and ashamed, he wanted to hide behind his conduct and wanted to hide any sign that he was there that day.

The government's request of 24 months' incarceration is excessive and seems to be based mostly on Mr. Allan's words – which he posted online, repeating the same rhetoric and propaganda of others, with no real audience or reason to believe that anyone would act based on his words. Mr. Allan acknowledges that he should be punished but the punishment should be based on his actions and what actually occurred that day. In looking at his actions closely, counsel respectfully submits that the government's request and the estimated sentencing guideline range are not proportionate to Mr. Allan's conduct.

Since January 6, 2021, Mr. Allan has truly distanced himself from the events and has done nothing but continue to provide for his family by working tirelessly to grow his business. He not only regrets his actions deeply and sincerely, he regrets disappointing his fellow countrymen. Furthermore, he acknowledges that he was encouraged by the former President Trump and has disavowed himself from any

dangerous propaganda that led him to commit a crime. He wrote a letter to express his remorse to the Court saying:

> My actions did not advance the causes of freedom and liberty but instead created an impediment. My actions were inconsistent with my morals, beliefs, and overall approach to life; honesty, integrity, hard work, family, country, and God. I deeply regret my behavior and feel profoundly ashamed.

*See* Exhibit 1, Letter from Tommy Allan.

Since January 6, 2021, Mr. Allan has been compliant with his pre-trial supervision and United States Probation has even noted in its recommendation that it does not believe he poses a safety concern to the community. *See* ECF No. 43.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a lengthy period of incarceration as the government suggests is not warranted. Based on a thorough consideration of each sentencing factor, Mr. Allan respectfully requests that the Court grant a substantial downward variance from the guideline range of 21-27 months.

## **BACKGROUND**

On August 11, 2022, Mr. Allan entered a guilty plea to one count of Obstruction of an Official Proceeding in violation of 18 USC §1512(c)(2) for his participation in the events on January 6, 2021. On that day, he attended the "Save America" rally where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[1]"

---

[1] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

The Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd (including Mr. Allan) on January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen.....We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy....Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave.**[2]

Even as the Capitol building was getting ravaged by a crowd with no leader, the former President Trump did and said nothing for hours.[3] The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike

---

[2] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[3] Jonathan Allen, *On Jan. 6, Trump ignored all pleas to call off the mob attacking the Capitol while 'pouring gasoline on fire' aide says*, NBC News, July 21, 2022, available at https://www.nbcnews.com/politics/congress/prime-time-jan-6-hearing-focuses-trumps-inaction-187-minutes-mayhem-rcna36737

Pence didn't have the courage to do what should have been done to protect our

country and our Constitution.[4]"

## **ARGUMENT**

### I.    **Legal Standard**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v.*

*United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),

have dramatically altered the law of federal sentencing.  While courts must

continue to consider the sentencing guidelines, Congress has required federal courts

to impose the least amount of imprisonment necessary to accomplish the purposes

of sentencing as set forth in 18 U.S.C. §3553(a).[5]  As the Supreme Court made clear

in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be

considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the

Guidelines cannot be used as a substitute for a sentencing court's independent

determination of a just sentence based upon consideration of the statutory

---

[4] Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).
[5] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id.* At *2. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

## II.     **Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

### a.  Mr. Allan's Personal History and Characteristics

Mr. Allan was born and raised in California, where he remains today with his family. He was raised by both of his parents, although his father and mother divorced when he was only 12 years old. Mr. Allan lived with his mother after the divorce until he started high school and moved in with this father. Mr. Allan had an average childhood and graduated from high school in 1986. Unfortunately, his father passed away at the young age of 58 from heart disease but he still has a close relationship with his mother.

After high school, Mr. Allan enlisted in the US Army and completed his basic training at Fort Benning Georgia and was then stationed at Fort Stuart Georgia for

the next two years. He earned an Expert Infantry Badge and received an honorable discharge. *See* PSR Par. 84.

After his military discharge, Mr. Allan attended college and earned a Bachelor's degree in Environmental Engineering in 1995. *See id*. Mr. Allan worked as an engineer for seven years but left his career to pursue his dream of entrepreneurship. In this pursuit, Mr. Allan became a real estate investor shortly before the largest housing crisis of our country's history. As a result he lost all of his homes and his business and had to start all over again. It was during this time that he met his current wife and they married in 2013 having a daughter together who is now 8 years old. Mr. Allan also has a daughter, who is 16, from a previous relationship. He fought for years to gain custody of his daughter after his ex-girlfriend took his daughter out of the state without his permission. Unfortunately, he has not been able to speak with her since despite his constant efforts to do so.

In 2013, Mr. Allan and his wife started a business together called Toddler Town, which is a gym for toddlers who are accompanied by their parents who bring them to enjoy the many mats and various toys in the facility. Mr. Allan has put his heart and soul into this business, which is finally doing decently after struggling through the hurdles the national pandemic posed to businesses around the world. Through this business, Mr. Allan has been positively contributing to his community and supporting his family.[6] Many customers have expressed their love for the gym on the business's Facebook page:

---

[6] https://www.facebook.com/toddlertownusa/

Next to Disneyland, this is the happiest place on earth. The owners
will immediately feel like family, the staff are like old friends and the
newly expanded facility has absolutely everything you could want.
They hosted my two year olds birthday party and I cannot wait to
carry on the tradition with my two week old.

I am not big on writing reviews but we love this gym. The owners are
amazing and the staff is kind and caring. Miss Holly, Miss Janette and
Tommy have been nothing but amazing. My daughter loves classes! We
have been coming here for over 2 years.

*See* Exhibit 2, Reviews from business (formerly known as Tiny Tumblers). Mr. Allan

works hard every day with his wife to keep this business afloat so that he can

continue to support his family and provide a meaningful service to his local

community.



Mr. Allan was never really engaged in politics until the former President

Trump convinced him and millions of other constituents of his unique and drastic

"America First" policies that promised freedom and prosperity for people like Mr.

Allan, "The forgotten man" – who owned a small business. Based on this, Mr. Allan

gradually became an avid supporter. When President Trump lost the 2020 election,

he was also successful in convincing Mr. Allan not only that there was corruption

and voter fraud but that the American citizens were responsible for doing

something about it.

### b. Nature and Circumstances of the Offense

When Mr. Allan decided to attend the rally in D.C. on January 6, 2021, he

was not part of any organized group, did not engage in any pre-planning, and was

completely alone. Despite some of his exaggerated Facebook posts that the

government displays in its sentencing memorandum, Mr. Allan actually came to

D.C. as a Trump fan – not wearing battle gear or carrying weapons – but simply

wearing a winter Trump hat, blue jeans, and a hooded sweatshirt.



Mr. Allan came not as a part of any organized group, but as an individual who truly felt the election was stolen from him and who wanted answers to this believed corruption. Mr. Allan attended the rally and heard Republican leaders, including Former President Trump, encourage the crowd to make their voices be heard so that an illegitimate President did not get elected. Former President Trump himself encouraged the crowd to go down to the Capitol building and assured them that he would join them there.[7]  After the rally was ended at approximately 1:15 p.m., Mr. Allan went back to his hotel room. In route, Mr. Allan paused for about 10 minutes at a street grate, which was venting heat, to warm himself and converse with others that had gathered – leading him to go back to the hotel room to take a break from the cold. It was at that time that he posted on Facebook at 2:12 p.m. "To the Capitol we go! Some have already stormed the barricades. Patriots!"[8] Mr. Allan observed other posts on social media discussing a large crowd already being on the grounds, however he had no idea at this time that individuals breached the building and that there was violence. After warming up in his hotel room, Mr. Allan walked to the Capitol building. On his way, he posted a picture with the caption "everybody is marching to the Capitol." As Mr. Allan approached the Capitol building, he observed thrones of people crowding the stairway on the capitol grounds and

---

[7] According to testimony from the House of Representatives January 6th Committee, Former President Trump tried to go to the Capitol building after the rally but was re-directed by his security staff. *See* Gerrad Kaonga, What Donald Trump Limo Video on Jan. 6 Reveals, Newsweek (June 29, 2022) available at https://www.newsweek.com/donald-trump-presidential-limo-capitol-january-6-committee-cassidy-hutchinson-1720126 (last viewed November 30, 2022).

[8] Facebook post at 19:12:27 UTC time. *See* Gov't Sent. Memo at 10.

climbing ropes up the wall, which prompted him to post their "storming the Capitol, they're literally storming the walls."

As Mr. Allan stood on the northwest lawn, he was curious to see what was occurring on the Upper West Terrance above but his vision was obstructed by the retaining wall and the nearby wide staircase was clogged with hoards of people. Mr. Allan noticed that a rope was dangling from the nearby staircase wall and figured this was his only hope of viewing what was happening on the Upper West Terrace above. Mr. Allan climbed the rope and began to walk to the northwest courtyard; notably not seeing any police activity. It was not until he arrived on Northwest Courtyard and had a clear view of the building that Mr. Allan realized that people had actually stormed the building. Mr. Allan noticed that people were walking into the Capitol through open doors nearby and followed them. Mr. Allan now knows that the worst decision of his life was that instead of turning back, he followed the crowd.[9] It is important to note, however, that he did not experience any confrontations with police and was not met with resistance from law enforcement while on the grounds or when entering the building. He also did not see individuals being tear gassed or hit with rubber bullets or any other conflict with authorities. Mr. Allan entered the building through the Parliamentarian Door at 2:45 p.m., after rioters had already breached that point. Unlike many other points of entry, Mr.

---

[9] Mob mentality is fueled when there is no apparent structure or strategy and when the crowd has no shared goal or common plan. *See* Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021) available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html (last viewed November 30, 2022).

Allan did not observe any "chaos" or violence upon entering as shown in this screenshot below:



While inside the building, Mr. Allan did not realize the gravity of what was happening around him. Notably, he is looking at his phone often suggesting he cared more about what was occurring on social media than what was happening right in front of him.



It is also notable that when Mr. Allan entered the Parliamentarian office, he did not witness people "rummaging through files, destroying furniture, stealing, and throwing books and papers on the floor" as the government incorrectly states in its memorandum. These events occurred before Mr. Allan entered the office and he did not observe these things taking place. What he did observe, however, was a ransacked office and did not approve of the actions of other rioters who had caused this damage.

After turning away from the Parliamentarian office, Mr. Allan did not spend 15 minutes roaming the hallways and visiting offices. In fact, he remained generally in the hallway he had just entered due to the crowding in front of him. He did notice a flag close by in the hallway which had become ajar from its stand and he grabbed it. When walking through the hallways, Mr. Allan did engage in discussion with Capitol Police attempting to contain the rioters. However, the government is incorrect that he "points his finger in one officer's face." *See* Gov't Sent. Memo at 15. When watching Government's Exhibit 10, it is clear that Mr. Allan is not being aggressive but is rather having a heated discussion. When he points his finger, it is in a forward direction but it is not in the officer's face as he maintains his distance from the officer.



In fact, when watching the rest of the video, Mr. Allan appears to be having a very peaceful back and forth with the officer, at one point nodding his head at the officer. *See* Government Exhibit 10 at 1:17. Most importantly, Mr. Allan does not try to push past police but rather turns down a hallway and distances himself from the



Crowd that ultimately pushes past police. In its sentencing memorandum, the government suggests he only steps aside to adjust his flag. *See* Gov't Sent. Memo at 16. However, that speculative argument is belied by the fact that Mr. Allan is never violent the entire time and by the fact that he never joins a group effort to breach a police line. In fact, when watching Government's Exhibit 10, it is clear that Mr. Allan wanted no part of any violence and he moved aside because he could sense rioters behind him trying to make a push forward and he did not want to be involved with a potential confrontation. That is why he moved out of the way. When he saw people moving down the hall, he rejoined them. *See* Government's Exhibit at 1:57.

Mr. Allan then entered the Senate Chamber at about 3:03 p.m., long after members of Congress are evacuated. Notably, he entered 11 minutes after the first person (Jacob Chansley) entered after he already observed people inside. Mr. Allan did not pre-plan entering the Senate Chamber and did not know where it was in the Capitol building. He entered through the Senate side of the building and did not wander far (basically two right turns) before he stumbled upon the Chamber. *See* part of Government Image 1,



Gov't Sent. Memo at 5. Also of note, seconds before he entered into the Senate Chamber, a security guard is seen inside calmly speaking with another intruder. *See* Gov't Exhibit 12 at :03. Seconds later, the video shows Mr. Allan walk in where he would clearly see that same officer calmly standing there and then continue speaking to other intruders.





So while the government attempts to portray the scenario as one where Capitol Police try to "force" people out (Gov't Sent. Memo at 18), the whole picture says something different. In fact, at minute 4:54 of Gov't Exhibit 12, Mr. Allan is calmly chatting with members of Capitol Police and/or security.



At this time, law enforcement is not "forcing" anyone out. When more officers arrived and told people they had to leave, Mr. Allan left immediately without having to be physically forced out. *See* Gov't Exhibit 12 at 5:45.

When Mr. Allan entered the Senate Chamber, he recognized the room from watching television previously. He immediately walked toward the dias and as he did, heard commotion behind him. He assumed it was more destructive behavior given what he had seen in the Parliamentarian office. This prompted Mr. Allan to say, "Not this room, this is the Senate." It was then that someone standing on the dias said, "We should pray." The commotion stopped and they prayed. As disturbing as Mr. Allan's behavior was, he did not want to see the Senate Chambers damaged. Unfortunately he did take some papers out of curiosity and he deeply regrets doing so. These papers were a calendar for that day and Mr. Allan later boasted to other

rioters that he took it off Mitch McConnell's desk, which was obviously not true. Mr. Allan was only in the Senate chamber for 5 minutes. At that time, he left immediately when officers instructed them to do so and surrendered the flag peacefully and followed officer commands. *See* Gov't Exhibit 15.



After that, Mr. Allan left the Capitol building voluntarily and in a respectful manner, not arguing with law enforcement. As Mr. Allan headed back to his hotel he stopped to speak to some individuals. It was during this conversation that Mr. Allan recapped what occurred in the Senate chambers and explained he told others not to "destroy our senate.[10]" Mr. Allan then went back to his hotel and posted a couple more boastful comments that did not reflect his actions that day. When he woke up in the morning, it began to sink in what he had done the day before and he was horrified at his own actions. He could not believe what he had participated in and was deeply ashamed. That is why he deleted his Facebook account and got rid of the documents he took from the Senate Chamber.

Ever since January 6, 2021, Mr. Allan has completely distanced himself from the events and has wanted nothing more than to move on with his life. He has been working hard growing his business and financially providing for his family. Despite

---

[10] The government in its memorandum mistakenly thinks he is saying "Don't destroy our sit-in," however he is actually saying "Senate" not "sit-in."

the government's false claim that he expressed no remorse, Mr. Allan was and is genuinely sorry for his actions which he expressed to his wife and close friends immediately following January 6, 2021. His sorrow has plagued him every day since also giving him great anxiety about his future.

Thankfully, Mr. Allan does have support from his family and friends as described in their letters to the Court. *See* Exhibit 3, Letters of support. All describe him as a hardworking and caring individual who cares very much for his family *Id*.



Mr. Allan's wife explains that he is an integral part of the family who "plays a very large role in our daughters homeschooling and is VERY active in her daily life. Tommy is Gracie's hero and without her dad she is going to be lost." *Id*. Mr. Allan's wife further writes:

> In the days and weeks before January 6th I never once heard or witnessed him talking about or planning anything other than attending a peaceful protest....Tommy and I are firm believers in law and order and we both understand there has to be a punishment for his actions. *Id*.

## RESPONSE TO INACCURATE GOVERNMENT ACCUSATIONS

The government has made some incorrect and exaggerated claims in its sentencing submission. As an initial matter, the government has tried to portray Mr. Allan as a dangerous seditionist rather than what he actually is: a vulnerable individual who was just repeating the political rhetoric that his own President at the time inspired. It is worth going into a detailed breakdown of the government's incorrect claims because Mr. Allan should be sentenced only for his conduct and not for conduct that is speculative, over dramatic, and at times plainly false. The government's attempt to unfairly group *all* these defendants together to fit their narrative of what occurred on January 6, 2021 should be sharply rejected as Mr. Allan is an individual who is entitled to an individualized and personal assessment under the 3553(a) sentencing factors.

**"Allan's Facebook posts were filled with claims that the 2020 election had been stolen and that violence was needed on January 6th to stop the transfer of power to Biden…" He planned for weeks to "fight" and "storm" the Capitol Building itself."** *See* **Gov't Sent. Memo at 7, 30.**

The government conveniently pulls posts from Mr. Allan's Facebook account that discuss political rhetoric to suggest that he meant his words literally. "Stand up and fight" "We stand and fight now for our country" "I am marching to the battlefield." These phrases are all ones that President Trump at various points in his campaign has said to his constituents that Mr. Allan is just merely repeating. Had Mr. Allan actually intended/and or planned for violence, he would have brought with him weapons or battle gear. He would have met up with paramilitary groups. He would have been violent at the Capitol building when he had the

opportunity to do so. None of these things happened. In reality, Mr. Allan was "all talk" and a man behind a computer screen who was angry at the stolen election. In reality, Mr. Allan was alone and wore a Trump hat with a bushel at the top of it, blue jeans, and a sweater. In reality, Mr. Allan was peaceful and followed officer commands. The only thing that Mr. Allan "planned for weeks," was his trip to D.C. to attend the rally and to potentially see what was going to happen.

**"Prior to arriving in Washington, D.C., Allan was already focusing on occupying the Capitol Building, as opposed to merely attending the rally...Allan posted an advertisement for something called "Operation Occupy the Capitol."** *See* **Gov't Sent. Memo at 8.**

In reality, Mr. Allan had no idea what was going to happen at the Capitol building and was simply sharing items that were being sent around on social media, including this advertisement. Notably, however, the advertisement calls for everyone to meet at 12:00 p.m. At that time, it is not disputed that Mr. Allan was at the rally and not the Capitol building and that he did not arrive on the grounds until after 2:30 p.m. The government conveniently chooses these Facebook posts to make Mr. Allan appear as something he is not. Mr. Allan's actual conduct on January 6, 2021, is entirely inconsistent with the Facebook posts that the government clings to in order to dramatize his conduct.

**"Allan also expressed a desire to meet various paramilitary groups....said he was hoping to hook up with the Proud Boys...One of Allan's posts shows members of the Three Percenters posting their picture with the message 'These are my people. PATRIOTS.'"** *See* **Gov't Sent. Memo at 9.**

Firstly, had Mr. Allan actually been affiliated with extremists organizations, there would be evidence of that and Mr. Allan would have met up with them in D.C.

However, Mr. Allan was not affiliated with the Proud Boys or the Three Percenters. We know that because he did not meet up with the Proud Boys or the Three Percenters and did not have any communications with them prior to January 6, 2021. When Mr. Allan, by chance, stumbled upon a couple Three Percenters on January 6, 2021, he did not realize who they were. In his mind, these individuals looked like Rangers and he was former infantry himself, which is why he commented that they were "his people." The government points out that Mr. Allan was a member of a Facebook group called 3% of California but is unable to point to a single interaction with an actual Three Percenter on Facebook. *See* Gov't Sent. Memo at 10. That is because there was no relationship that actually existed. Mr. Allan joined the page on a whim but never communicated with them and certainly was not affiliated with the group. To join a Facebook group, all one has to do is press a button. As such, most people belong to hundreds of random groups on Facebook. That does not mean that Mr. Allan is actually a member of that group and to suggest so is misleading given the actual evidence in this case. Lastly, Mr. Allan does not even know much about the Proud Boys and had simply heard of them through the grapevine. Now knowing what they stand for, he would never have expressed a desire to meet them.

**"Allan stood with his arm raised as Chansley issued an incantation over his bullhorn, accusing members of Congress of being "traitors." *See* Gov't Sent. Memo at 17.**

As an initial matter, Mr. Allan did not know Jacob Chansley and by happenstance ran into him that day. The government's attempts at connecting the

two individuals is also misleading as they were just present at the same time and had no relationship. Secondly, Mr. Allan did not raise his arm in response to Chansley's comments about Congress being traitors. Rather, he raised his arm in response to a prayer that Chansley was chanting. *See* Gov't Exhibit 14 at :45. Below is a screenshot showing Mr. Allan's arm on the left at the moment Chansley is saying a prayer saying, "Thank you to our present creator, our God." *Id*.



Mr. Allan does not raise his arm before that when taking a close look at the whole video. Lastly, the government again tries to connect Mr. Allan and Mr. Chansley together when saying that while exiting the building that Allan "raised his arms in triumph, and as Chansley yelled to the crowd, Allan held up stolen papers to show the crowd." *See* Gov't Sent. Memo at 20. However, when taking a look at Gov't Exhibit 18, the two actions are completely unrelated. The two walked out of the Capitol building at the same time and there is simply no evidence of them acting in tandem as the government tries to imply. Mr. Allan has taken responsibility for the things that he did do and say that day, however he should not be held responsible for accusations such as this that did not take place.

**"Allan saw the rioters using stolen barricades as ladders and attacking the outnumbered police at the Northwest steps."** *See* **Gov't Sent. Memo at 30.**

Mr. Allan did not see any such thing and the government is simply speculating that he would have seen such things at this time. The videos that the government submit do not show anyone attacking police. It is true that this occurred earlier before Mr. Allan arrived, however Mr. Allan did not observe assaults on police, tear gassings, or any other confrontations with police on the Northwest steps. The only thing he observed was people trying to break in windows, which is what he narrated in Gov't Exhibit 6.

**"Allan declined to speak voluntarily with FBI….and has never offered to speak with law enforcement officials about the events on January 6."** *See* **Gov't Sent. Memo at 31.**

This is not true. In reality, Mr. Allan actually spoke voluntarily to the FBI for 45 minutes when they came to his home. When the FBI arrived at his house, Mr. Allan was working on the lawn. He spoke with them for 45 minutes, at times letting them know he would need a lawyer to answer certain questions. After 45 minutes, Mr. Allan told law enforcement he would prefer to have a lawyer present. At that time, the FBI gave Mr. Allan contact information for a lawyer. That night, Mr. Allan called that lawyer to discuss cooperating with law enforcement. His counsel set up a meeting with FBI to talk and the FBI sent him a questionnaire to fill out. Based on his answers to this questionnaire, the FBI told Mr. Allan that it was not urgent to speak with him immediately, but a meeting was tentatively scheduled for later in the week in conjunction with his lawyer at the time. Shortly thereafter, Mr. Allan was arrested. Mr. Allan had a couple different lawyers after that and was

indicted for felony charges. Mr. Allan chose to invoke his constitutional right against self-incrimination after the criminal process was underway.

The government clearly did not present the full picture when it claimed that Mr. Allan "declined" to speak with the FBI. It is also troubling that the government has been implying in these January 6 cases that by somehow invoking an undeniable constitutional right that a defendant thereby shows a lack of remorse. Mr. Allan had absolutely no obligation to speak to the FBI, although he did for 45 minutes. Despite the government's attempts to undermine his remorse, Mr. Allan has demonstrated that from the beginning, he did not wish to have a trial but wanted to work towards a plea agreement. Simply because he was not the first one to plead guilty does not mean he was not remorseful. At every court proceeding, Mr. Allan made it clear he did not want a trial. He has had a couple different lawyers, and subsequent indictments, which delayed his process through no fault of his own.

There is also a compelling reason why lawyers typically advise criminal defendants not to speak to law enforcement without a lawyer present because of the risk that statements will be taken out of context or that defendants will not remember the full extent of their conduct. The government has been quick to call out defendants for not volunteering to speak to law enforcement in a setting where criminal defendants have an absolute right against self-incrimination, a constitutional amendment designed to protect due process rights during a government investigation. It is also during this time that suspects naturally want to defend their actions in the hopes that they will be treated leniently. When a

criminal defendant invokes their right to have a lawyer present, it is simply to protect themselves and should never be taken as an indication that the individual is not remorseful.

Lastly, the government fails to take into account that remorse is not something that always happens immediately and that in most scenarios it takes time for it to develop. Remorse also becomes stronger over time – after the initial desire to defend yourself subsides and a period of reflection begins. Mr. Allan's remorse has been shown in many different ways, including the fact that he entered a guilty plea in this case, cooperated with the large amounts of responsibilities that come with being on pre-trial supervision, and sincerely expressed remorse to the Court. Lastly, Mr. Allan distanced himself from his social media presence and is focused on his business and his family. He has also contributed positively to his community through his business and by being charitable to customers in need. Just recently, Mr. Allan offered a free membership to a child who had a brain tumor and had to go undergo extensive surgery. *See* Exhibit 4, Thank you Letter.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on Mr. Allans's success on pre-trial supervision for the past two years, the Court can be assured that it is unlikely he will repeat the same conduct. As discussed at length above, Mr. Allan has already been deterred as he has been his own worst critic and in constant anguish over his actions that day.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of 18 U.S.C. §1512(c)(2) further demonstrates that a significant variance is warranted in the instant case.

- *US v. Matthew Wood*, 21-cr-223 (APM): After consideration of all of the sentencing factors, the court rejected the government's request for 57 months' incarceration and imposed a sentence of one year home confinement for a defendant who was convicted of 18 U.S.C. §1512(c)(2). Like Mr. Allan, Mr. Wood had similar social media posts, all just boastful comments, such as "Raid Congress," and "be brave heart in that bitch." Mr. Wood then climbed a media tower and encouraged others forward. Unlike Mr. Allan, however, Mr. Wood was also allegedly hit with a tear gas bomb when he neared the House Chamber. Also unlike Mr. Allan, Mr. Wood allegedly and potentially accidentally pushed against MPD officers trying to clear the Rotunda and spent approximately 80 minutes inside the building. After January 6, Mr. Wood also posted comments bragging about conduct he did not actually do and deleted his Facebook account. However, the court took into account many mitigating factors, such as the fact that Mr. Wood turned himself in, traveled to D.C. with his grandmother, and also fell victim to the manipulation strategies and propaganda spread by of our former President. Mr. Wood was also only 23 years old. Like Mr. Allan, he went to the Capitol with no battle gear and no weapons.

- *US v. Richard Michetti,* 21-cr-232 (CRC): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Michetti's sentencing guideline range was 15-21 months. The government accused Mr. Michetti of yelling at police while they were being assaulted by others – calling them "fucking animals." The government also alleged that he briefly pinched the sleeve of another officer and continued to push against a police line in the Rotunda after being hit by chemical spray. Although Mr. Michetti did not delete evidence after January 6, Mr. Allan also did not swear at police and push against any police lines.

- *US v. Paul Hodgkins,* 21-cr-188 (RDM): defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Hodgkins was accused of entering the Senate Chamber as well, but unlike Mr. Allan, he brought a backpack containing protective eye goggles, rope, and white latex gloves.

There are also defendants who were offered a plea to Civil Disorder in violation of 18 U.S.C. §231(a)(3) whose cases are comparable and involved similar and even more egregious conduct.[11] Simply because the guidelines are substantially lower than the Obstruction charge, many of these defendants received significantly lower sentences than defendants who pled guilty to 18 U.S.C. §1512(c)(2) despite their conduct being fairly similar and/or more aggravating.

---

[11] In extending these offers, the government seems to be drawing the line in the sand at whether or not the defendant entered into the Senate Chamber or other sensitive areas without taking into account some of the other more egregious conduct that far outweighs non-violent conduct of those who did find themselves in sensitive areas.

- *US v. Aaron Mostofsky, 21-cr-138 (JEB):* Defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3) and 18 U.S.C. §641. Mr. Mostofsky's guideline range was 12-18 months simply because the Civil Disorder guidelines call for a much lower range. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also allegedly took a bullet proof vest that a Capitol Police officer was wearing and later wore this along with a riot shield he found. Also unlike Mr. Allan, Mr. Mostofsky arrived at 1:30 p.m., when the crux of the violence was taking place.

- *US v. Jerry Ryals*, 21-cr-244 (CKK): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). He allegedly entered Capitol building saying "we definitely have enough people to overthrow this bitch," and tried to break down a locked office door with a sign and his shoulders. That door was eventually broken after other rioters joined his efforts. Mr. Ryals later allegedly posted that he was a patriot and that the country was headed to war.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Defendant sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors

and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. David Blair,* 21-cr-186 (CRC): defendant sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after assaulting officers with his stick.

It is also worthwhile to analyze some of the past misdemeanor sentences with aggravating conduct because it further highlights the sentencing disparities that have resulted simply based on arbitrary lines that the government has drawn when extending plea offers. For example, the individuals highlighted below were offered misdemeanors presumably because they did not enter the Senate Chamber or they did not assault an officer. However, some of their conduct is actually even more egregious than Mr. Allan's. Because Mr. Allan went into the Senate Chamber and posted comments about "storming the building", he is now facing a much more significant sentence than misdemeanants with similar/and or more aggravating conduct.

• *US v. John Lolos,* 21-cr-243 (APM): Mr. Lolos was sentenced to 14 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government accused Mr. Lolos of making troubling statements and posts while in the Capitol building where he remained for 43 minutes.  The government also alleged that after leaving the Capitol building, Mr. Lolos posted a video to twitter shouting "They left! We did it!" Unlike Mr. Allan, the government also accused Mr. Lolos of chanting at police officers while inside the Capitol and causing disruption on his plane ride back home –resulting in the plane having to turn around.

• *US v. Gracyn Courtright,* 21-cr-72 (CRC): Ms. Courtright was sentenced to 30 days' incarceration followed by 12 months' supervised release after pleading guilty to 18 U.S.C. §1752(a)(1). The government accused Ms. Courtright of picking up and carrying around a "Members Only" sign and briefly stepping onto the Senate floor while inside the building. The government also accused her of minimizing her conduct post January 6, 2021. The government accused Ms. Courtright of chanting at a line of officers and posting many statements to twitter following January 6, 2021, showing a lack of remorse.

• *US v. Vukich and Peretta,* 21-cr-539 (TSC): Defendants sentenced to 30 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). Vukish and Peretta were also accused of taking paperwork off the floor and

these defendants were also have alleged to have made some unfortunate statements while in the building and afterwards.

• *US v. William Tryon,* 21-cr-420 (RBW): Mr. Tryon was sentenced to 50 days' incarceration after pleading guilty to 18 U.S.C. §1752(a)(1). The government alleged that Mr. Tryon was actually met with resistance from Capitol Police while attempting to gain entry into the Capitol building. The government also accused him of refusing to comply with Capitol Police commands and was pepper-sprayed and hit by a baton by them. Mr. Tryon allegedly did not give up and eventually gained entry into the building.

• *US v. Jeffrey Register, 21-cr-349 (TJK):* Mr. Register was sentenced to 75 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government accused Mr. Register of being on the Grounds and inside the Capitol building for 90 minutes, deliberately destroying evidence, and telling FBI that he never went inside the building. Notably, the government also accused Mr. Register of running past officers who were trying to contain a surge of rioters. The government further alleged that Mr. Register waved the crowd towards an access point to the Speaker's Lobby and eventually witnessed the killing of Ashli Babbit.

• US v. Camper, 21-cr-325 (CKK): Mr. Camper was sentenced to 60 days' incarceration. Mr. Camper allegedly gave a television interview after exiting the Capitol building, saying his actions were justified because he was operating under the "insurrection act." The government also accused him of

burying Go-Pro footage from January 6 in the ground. He also allegedly maintained to the FBI that he had done nothing wrong and believed he was in a "combat" state of mind while at the building.

All of these past cases highlight the fact that there has been inconsistencies across the board with how the government has been charging cases and with the plea offers it extends. Nonetheless, these past sentences further support a significant variant sentence in the instant matter.

### General Deterrence

Sentencing Mr. Allan to 24 months' incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again[12] Even if it did, the public will not be deterred by a simple man from California who is not an extremist. Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[13] Individuals like Mr. Allan have already been deterred by this threat of prosecution, especially because most of them have not been exposed to the criminal justice system and prison sentences. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Incarceration with most of these cases is not the answer

---

[12] See transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").
[13] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

and perhaps to really effect general deterrence, something very different is needed so that individuals do not fall victim to the dangerous propaganda that incited January 6, 2021.

The Honorable Amit P. Mehta alluded to this dilemma in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country with good backgrounds, steady jobs, and often times even Veterans, came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…the idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. *Id*.

## CONCLUSION

For the reasons stated above, Mr. Allan respectfully requests that the Court grant his request for a significant downward variance.  Mr. Allan also requests that a fine not be imposed in light of the fact that he has a $2,000 restitution obligation.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

34

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org